**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 11 1998**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS
TENTH CIRCUIT

---

RICHARD C. LYTLE,

      Plaintiff-Appellant,

v.

CITY OF HAYSVILLE, KANSAS, a
municipal corporation, and JAMES
EARL KITCHINGS,

      Defendants-Appellees.

No. 96-3197

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 93-CV-1322-KHV)

---

Jack Focht, Focht, Hughey & Calvert, L.L.C., Wichita, Kansas, for Plaintiff-Appellant.

Alan L. Rupe, Morrison & Hecker, L.L.P., Wichita, Kansas, for Defendants-Appellees.

---

Before KELLY, HOLLOWAY, and HENRY, Circuit Judges.

---

HENRY, Circuit Judge.

Richard C. Lytle was employed as a police officer by the City of Haysville,

Kansas from 1983 until 1991, when he was discharged after alleging that fellow

Haysville officers committed second-degree murder by failing to render emergency aid to the victim of a police shooting. He brought suit against the City of Haysville and its police chief, James Earl Kitchings, contending that the defendants had attempted to cover up police officers' misconduct and that he had been fired in retaliation for his allegations against them. The district court granted summary judgment for the defendants, and Mr. Lytle appeals.

We exercise jurisdiction under 28 U.S.C. § 1291. Because the important factual issues in this case are in reality undisputed and because the district court's decision involves questions of law under the appropriate balancing tests, we believe that this case is suited for summary judgment. For the reasons given below, we affirm.

## I. BACKGROUND

Responding to a traffic disturbance on the evening of December 7, 1990, Haysville police officer Luther Donald Meeks shot a Haysville resident, Datton Wilson, Jr., in self-defense. Within seconds of the shooting, Officer Meeks radioed the dispatcher to call emergency medical services. Lieutenant Bruce Powers and Officers Lanon Thompson and Tim Stock, all of the Haysville Police Department, appeared at the scene shortly thereafter.

Before the Emergency Medical Technicians (EMTs) arrived, the officers did not render emergency aid to Mr. Wilson. The officers had received

2

instruction in cardiopulmonary resuscitation (CPR) as part of their law enforcement training and had learned that they should not move or perform CPR on critically injured persons who are still breathing, as Mr. Wilson was. The EMTs arrived at the scene approximately six minutes after the shooting. They administered CPR and transported Mr. Wilson to the nearest hospital, where he was pronounced dead a short time later.

Approximately an hour after the shooting, Mr. Lytle arrived at the scene. By that time, the EMTs had already left with Mr. Wilson. According to his deposition testimony, Mr. Lytle asked Lieutenant Powers if the officers had performed CPR on Mr. Wilson before emergency medical personnel arrived. Mr. Lytle stated that Lieutenant Powers told him that the officers had not performed CPR because Mr. Wilson was, in Lieutenant Powers's words, "dead or dying anyway." Aplt's App. vol. I at 209 (Tr. of dep. of Mr. Lytle, dated Apr. 26, 1994). However, in two written reports concerning the Wilson investigation, prepared on December 8 and December 9, 1990, Mr. Lytle did not mention the "dead or dying" comment. See id. vol. II at 598-601.

Several months after the shooting, Mr. Lytle had several telephone conversations with Mr. Jerry Berg, an attorney for Mr. Wilson's widow. At that time, Mr. Lytle knew that Mr. Berg was demanding a grand jury investigation of the shooting and threatening to sue the City. On April 27, 1991, Mr. Lytle gave a

3

statement to Mr. Berg under oath. See Aplt's App. vol. II at 620-93 (Tr. of April 27, 1991 statement).

In his statement to Mr. Berg, Mr. Lytle explained that it was his wife who had first contacted Mr. Berg because the shooting had been troubling her husband. See id. at 624. Mr. Lytle then described his actions and observations on the evening of the shooting. He said that when he first arrived at the scene, Lieutenant Powers "just briefly told me what he wanted me to do, which was interview Mrs. Wilson." Id. at 628. Mr. Lytle said that he asked Lieutenant Powers "if they had performed any type of CPR or anything on the victim and he stated, no, he was going to die anyway." Id. at 629. Mr. Lytle said that he "was a little shocked because . . . that's the first thing that should have been done, somebody should have given [Mr. Wilson] CPR or at least applied direct pressure to the wound." Id.

Within a week of the shooting, Mr. Lytle added, Officer Stock gave him the same explanation as to why the officers had not performed CPR when they first arrived at the scene: "Mr. Wilson was dying or dead anyway." Id. at 638. Mr. Lytle agreed with Mr. Berg that the job descriptions for Haysville police officers required that "[i]f the victim is still alive, proper aid should be given." Id. at 632. According to Mr. Lytle, the officers should have followed this policy by giving first aid to Mr. Wilson. When questioned by Mr. Berg, he stated that the officers'

4

failure to render aid constituted second degree murder.  Id. at 648-49.

Mr. Lytle admitted to Mr. Berg that he was under orders not to discuss the Wilson case.   Id. at 633.  Additionally, he stated that it would have been appropriate for him to have talked to Chief Kitchings about his fellow officers' statements and that he should have done so.  Id. at 642.

On May 15, 1991, Mr. Lytle testified before a grand jury of the Eighteenth Judicial District of Kansas.  An attorney from the law firm representing the City of Haysville accompanied him, and Mr. Lytle gave him a transcript of the statement to Mr. Berg.  Around this time, Mr. Lytle also spoke with a reporter for the Wichita Eagle newspaper.  The newspaper ran articles that quoted Mr. Lytle as saying that Powers, Thompson, and Stock were to blame for Mr. Wilson's death.  The Haysville Pioneer, a local newspaper, also covered the Wilson controversy.

After reading about Mr. Lytle's allegations in the newspaper and reviewing his statement to Mr. Berg, Chief Kitchings investigated Mr. Lytle's allegations and determined that they were unsupported. The parties do not dispute that, after the newspaper reports of Mr. Lytle's allegations, morale in the Department decreased significantly.  Fellow officers distrusted Mr. Lytle and refused to speak with him.  Additionally, Mr. Lytle's charges undermined public trust in the Department, making law enforcement more difficult.  See Aplt's App. vol. I at

5

90-123.

On July 16, 1991, Chief Kitchings terminated Mr. Lytle's employment. The notice of termination cited Mr. Lytle's breach of the Department's confidentiality rules, but did not discuss the effect of Mr. Lytle's statements on the functioning of the Department. See Aplt's App. vol III at 964-66.

After his dismissal, Mr. Lytle brought this suit against the City and Chief Kitchings, alleging: (1) that his termination was in breach of an implied contract; (2) that he was discharged in retaliation for speech protected by the First Amendment (his statements to Mr. Berg and the press and his grand jury testimony); and (3) that his dismissal violated state law against retaliation for whistle-blowing. The defendants moved for summary judgment, and, during a status conference, the district court orally granted their motion on all of Mr. Lytle's claims. As to the First Amendment claim, the district court granted summary judgment for both defendants on the merits and for Chief Kitchings on the additional and alternative ground of qualified immunity.

## II. DISCUSSION

Mr. Lytle appeals the summary judgment granted against him on his First Amendment and state-law retaliatory discharge claims. He does not appeal the decision on his implied contract claim.

6

## A. Standard of Review

We review a decision granting summary judgment de novo, under the same legal standard applicable in the district court. See Miles v. Denver Pub. Sch., 944 F.2d 773, 775 (10th Cir. 1991). The de novo standard of review is appropriate in this case for the further reason that: "[i]n cases raising First Amendment issues . . . an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." Rankin v. McPherson, 483 U.S. 378, 386 n.9 (1987) (quoting Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 499 (1984)) (internal quotation marks omitted). Because the standard of review is de novo, we "may affirm on grounds other than those relied on by the district court when the record contains an adequate and independent basis for that result." Cone v. Longmont United Hosp. Ass'n, 14 F.3d 526, 528 (10th Cir. 1994).

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). In deciding whether a genuine issue of material fact exists, a court must draw all reasonable inferences

in favor of the nonmoving party.  See Anderson, 477 U.S. at 255.

## B.  Issues on Appeal

### 1.  First Amendment

Mr. Lytle first challenges the district court's grant of summary judgment against him on his First Amendment claim.  He maintains that the court's ruling infringes on the constitutional rights of public employees who uncover wrongdoing in governmental agencies.

### a. **Pickering** balancing

It is well-established that a government employer "cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." Connick v. Meyers, 461 U.S. 138, 142 (1983). We undertake a four-part inquiry in order to evaluate a public employee's claim that his employer has infringed this interest.  See Gardetto v. Mason, 100 F.3d 803, 811 (10th Cir. 1996).

First, we consider whether the speech in question addresses a matter of public concern.  Matters of public concern are those of interest to the community, whether for social, political, or other reasons.  See Connick, 461 U.S. at 145-149. In contrast, matters of only personal interest to government employees are not

8

protected by the First Amendment.  See id.

Second, if the speech does address a matter of public concern, the court must consider both employee's interest in expression and the government employer's interest in regulating the speech of its employees in order to maintain an efficient and effective workplace. See Gardetto, 100 F.3d at 811 (citing Pickering v. Board of Education, 391 U.S. 563, 568 (1968)); Moore v. City of Wynnewood, 57 F.3d 924, 931 (10th Cir. 1995).  Speech is protected if the employee's interest outweighs the interest of the government employer.  See Moore, 57 F.3d at 931.  This process of weighing the respective interests is known as "the Pickering balancing test."

Third, if the speech is protected, the employee must show that the speech was a substantial or motivating factor for the challenged governmental action. See Gardetto, 100 F.3d at 811 (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)).  Finally, if the employee shows that the speech was a substantial or motivating factor, the employer must be given the opportunity to show that it would have taken the same action in the absence of the protected speech. See id.

The Supreme Court has explained why a public employee's speech is not given unqualified protection, but rather is balanced against the employer's interest in efficient public service:

9

Government agencies are charged by law with doing particular tasks. Agencies hire employees to help do those tasks as effectively and efficiently as possible. When [an employee] . . . begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain [him].

Waters v. Churchill, 511 U.S. 661, 674-75 (1994).

Thus, "the government as employer . . . has far broader powers [over speech] than does the government as sovereign." Id. at 671. Outside government workplaces, "[t]he First Amendment demands a tolerance of 'verbal tumult, discord, and even offensive utterance,' as 'necessary side effects of . . . the process of open debate . . . .'" Id. at 672 (quoting Cohen v. California, 403 U.S. 15, 24-25 (1971)). Within government workplaces, however, the First Amendment demands considerably less: "The government cannot restrict the speech of the public at large just in the name of efficiency. But where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate." Id. at 675.

In balancing the employee's interest in expression against the government's interest in efficiency, a court must consider "the manner, time, and place of the employee's expression," as well as the events leading up to it. Rankin, 483 U.S. at 388. It is relevant "whether the statement impairs discipline by supervisors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes

10

the performance of the speaker's duties or interferes with the regular operation of the enterprise." Id. Additionally, an employee's responsibilities in the workplace are relevant to the Pickering balancing. See id.; Koch v. City of Hutchison, 847 F.2d 1436, 1449-50 (10th Cir. 1988) (en banc). "The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails." Rankin, 483 U.S. at 390.

In the instant case, in conducting the required First Amendment inquiry, the district court began by identifying the particular speech at issue. Although Mr. Lytle's complaint refers to three categories of allegedly protected speech--his statements to Mr. Berg, his statements to the press, and his grand jury testimony-- the district court considered only the first two categories. It reasoned that the defendants contended in their summary judgment motion that Mr. Lytle had not been terminated for his grand jury testimony and that Mr. Lytle did not dispute this contention in his objection to the defendants' motion. See Aplt's App. vol. III at 1093 (Tr. of Status Conference dated April 30, 1996) ("The way I read [the summary judgment briefs' discussion of the grand jury testimony] was that plaintiff claimed the termination was for talking to the attorney or for talking to the media and not specifically for talking to the grand jury."). The district court then concluded that Mr. Lytle's statements to Mr. Berg and the press did "touch a

matter of public concern." Id. at 1106.

Next, the district court conducted the Pickering balancing. It found that Mr. Lytle's interest in expression was outweighed by the City's interest in efficient public service and that his speech was therefore not constitutionally protected. See Aplt's App. vol. III, at 1106-07, 1113-19. As a result, the district court did not consider the third and fourth parts of the First Amendment inquiry (whether Mr. Lytle's speech was a substantial or motivating factor for Mr. Lytle's discharge and whether the discharge would have occurred in the speech's absence).

In this appeal, Mr. Lytle challenges the district court's application of the Pickering test, arguing that the district court erred in concluding that the City's interest in efficient public service outweighed his interests in free expression.[1]

---

[1] Mr. Lytle does not argue that there are any underlying factual disputes that affect the Pickering balancing and that should have been submitted to the jury. In this regard, we note that although the Supreme Court has concluded that "[t]he inquiry into the protected status of speech is one of law, not fact," see Connick, 461 U.S. at 148 n.7, there is some debate as to whether underlying disputes whose resolution might affect the Pickering balancing should be decided by the court or by the jury. See Waters, 511 U. S. at 693 (Scalia, J., concurring) (noting that the plurality opinion does not clarify what issues in the Pickering balancing are for the court and what issues are for the jury).

This circuit appears not to have reached that question, and other circuits are divided. Compare Joyner v. Lancaster, 815 F.2d 20, 23 (4th Cir. 1987) (concluding that matters underlying the Pickering inquiry "'were not factual issues for the jury,'" but "'involved questions of constitutional law for the court'" quoting Jones v. Dodson, 727 F.2d 1329, 1337 n.11 (4th Cir. 1984)) with Casey v. City of Cabool, Mo., 12 F.3d 799, 803 (8th Cir. 1993) ("[A]ny

12

He focuses on his status as a whistle blower, contending that because he "was a sincere whistle blower who felt the police department had failed to investigate his complaint," see Aplt's Opening Br. at 17, his statements were protected under the First Amendment. Significantly, Mr. Lytle does not challenge the district court's finding that the grand jury testimony is not at issue in his First Amendment claim.[2]

---

underlying factual disputes concerning whether the speech at issue was protected should have been submitted to the jury.").

In the instant case, because Mr. Lytle does not contend that the district court improperly resolved factual issues underlying the Pickering balancing, we need not resolve this issue.

[2] This circuit has concluded that a witness's sworn testimony in a court proceeding is entitled to heightened protection under the First Amendment. In Melton v. City of Oklahoma City, 879 F.2d 706, 714 (10th Cir. 1989), vacated on other grounds, 928 F.2d 920 (10th Cir. 1990) (en banc), we stated that a witness's interest in testifying at trial was "so strong in this case that any disruption or impairment of the enterprise would have to be extreme in order to justify preventing trial testimony." We found no evidence that the witness's trial testimony affected the operation of a police department and further noted that the witness "had a clear public duty to testify." Id. at 715. "In many instances, that duty might be enhanced by judicial compulsion. Certainly we would not expect a public employee to suffer contempt in order to preserve the efficiency and effectiveness of a public employer, even the police department." Id. Accordingly, we concluded that the plaintiff police officer's interest in testifying clearly outweighed what little disruption might have occurred.

Other circuits have adopted a similar view. See, e.g., Green v. Philadelphia Housing Authority, 105 F.3d 882, 888 (3d Cir.) (noting the strong interests favoring subpoenaed testimony because it implicates "not only the integrity of the truth seeking process and the effective administration of justice, but also the public's interest in protecting court-ordered conduct"), cert. denied, 118 S. Ct. 64 (1997); Pro v. Donatucci, 81 F.3d 1283, 1291 (3d Cir. 1996) (concluding that the government had "no legitimate interest" in regulating an employee's trial testimony and resolving Pickering balance in favor of the testifying employee); Wright v. Illinois Dept. of Children & Family Servs, 40 F.3d 1492, 1505 (7th Cir. 1994) ("[S]urely an employee summoned to give sworn

13

Upon considering the factors relevant to the <u>Pickering</u> balancing we conclude for the reasons set forth below that the district court properly found that the City's interests outweigh Mr. Lytle's interest in speaking to Mr. Berg and the press about a confidential police investigation and that as a result, these statements are not protected by the First Amendment.  Our application of the <u>Pickering</u> balancing renders it unnecessary for us to consider the third and fourth stages of the general First Amendment inquiry.

### b.  <u>Pickering</u> Applied to this Case

As the district court found and the parties acknowledge, Mr. Lytle's statements to Mr. Berg and to the press involve matters of public concern. <u>See</u> <u>Conaway v. Smith</u>, 853 F.2d 789, 796 (10th Cir. 1988) ("Speech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of city

---

testimony in a judicial proceeding has a compelling interest in testifying <u>truthfully</u> and the government employer can have an offsetting interest in preventing her from doing so only in the rarest of cases."); <u>Smith v. Hightower</u>, 693 F.2d 359, 368 (5th Cir. 1982) ("[T]he first amendment protects the right to testify truthfully at trial.").

In the instant case, because Mr. Lytle has not challenged the district court's conclusion that his grand jury testimony was not at issue in his First Amendment claim, <u>see</u> Aplt's App. vol. III at 1093-94,  we need not decide what weight to afford this testimony in the <u>Pickering</u> balancing.

However, we do note that Chief Kitchings stated to a reporter that Mr. Lytle "ha[d] a duty and obligation to testify to the grand jury" and that he did not terminate Mr. Lytle because of his grand jury testimony.  <u>See</u> Aplt's App. vol. III at 1017 (transcript of July 17, 1991 telephone conversation between Chief Kitchings and Phil LeBeau.).

14

officials, in terms of content, clearly concerns matters of public import.").  We therefore proceed to balance Mr. Lytle's interest in expression against the City's interest as an employer in regulating the speech in question.

We begin with Mr. Lytle's interests, noting the significance of the fact that he has accused government officials of serious wrongdoing.  "When balancing the rights of the employee against those of the employer, an employee's First Amendment interest is entitled to greater weight where he is acting as a whistle blower in exposing government corruption."  Id. at 797.

Nevertheless, there are also several important aspects of Mr. Lytle's speech that diminish his interests under the Pickering inquiry.  In considering the time, place, and manner of the disputed speech, this circuit has considered whether the employee used "less disruptive internal channels, rather than going outside the city administration."  Id. at 798; see also Johnsen v. Independent Sch. Dist. No. 3 891 F.2d 1485, 1494 (10th Cir. 1989) (noting that the court should consider whether the employee "used internal complaint procedures" and finding that the "[p]laintiff's decision to contact outside agencies prior to using the complaint mechanism of the school was unnecessarily disruptive because there was no indication that the internal mechanism would not be sufficient.").

Here, according to Mr. Lytle's own account, Lieutenant Coleman was the only person within the Haysville Police Department whom he had informed of the

15

"dead or dying" comments before he spoke to Mr. Berg about the Wilson case. Although he had submitted two written reports regarding his investigation of the Wilson shooting, these reports had a significant omission: Mr. Lytle failed to included any statements about the "dead or dying" comments. Further, Mr. Lytle made no other written record of them before he spoke to Mr. Berg. Additionally, before he spoke to Mr. Berg, Mr. Lytle had not discussed these alleged comments with Chief Kitchings, and he has offered no justification for his failure to do so. Even as to Lieutenant Coleman, there is no indication that, before he spoke to Mr. Berg, Mr. Lytle followed up his initial conversation about the "dead or dying" comments in any way. As the Supreme Court has noted, "[t]he burden of caution [an employee] bear[s] with respect to the words [he] speak[s]" varies with his job responsibilities. Rankin, 483 U.S. at 390. Mr. Lytle's responsibilities as a police officer who had worked on the Wilson investigation clearly called for a degree of caution that he failed to exercise. We therefore conclude, just as in Johnsen, that Mr. Lytle's failure to pursue his allegations internally indicates that his speech was "unnecessarily disruptive." Johnsen, 891 F.2d at 1494. That conclusion diminishes the weight we afford his interest in the Pickering balancing.

Moreover, a government employee's interest in whistleblowing is entitled to little weight if a reasonable person in his shoes would not have believed that there was government corruption or wrongdoing. Cf. Moore, 57 F.3d at 933

16

(assuming, without deciding, that recklessly false allegations of wrongdoing "are either unprotected by the First Amendment or, at least, that such intentional falsity would weigh heavily against protection"); Johnsen, 891 F.2d at 1493 (affording less weight to an employee's interests because her erroneous statement was "at least careless and could be characterized as reckless in light of the predictable impact that such a statement would have upon the public").  Thus, under the Pickering inquiry, we must consider whether there was a reasonable basis for Mr. Lytle's two principal allegations of wrongdoing: (1) that his fellow officers committed second degree murder by failing to render aid to Mr. Wilson and (2) that the Department sought to coverup the officers' misconduct.

As to the failure to render aid to Mr. Wilson, we do not believe that it was reasonable for Mr. Lytle to conclude that there was government misconduct. The evidence indicated that the officers' decision not to perform CPR was based on the training that they had received.  Moreover, Mr. Lytle himself had been trained not to move or give first aid to critically injured persons who are still breathing, because doing so risks further injury and might do more harm than good.  See Aplt's App. vol. I at 305 (Tr. of dep. of Mr. Lytle, dated Feb. 24, 1993).  Although Mr. Lytle's suggestion that direct pressure should have been applied to Mr. Wilson's wound may merit evaluation by the Department, there is no evidence in the record indicating that the officers' failure to render first aid was

17

motivated by an intent to harm Mr. Wilson or reflected reckless indifference to his welfare.[3]

We reach a similar conclusion as to Mr. Lytle's allegation of a Department coverup. We note that, as evidence of such a coverup, Mr. Lytle points only to the following: after the shooting, Mr. Lytle reported Lieutenant Powers's "dead or dying" comment to Lieutenant Coleman, and Lieutenant Coleman did not order Mr. Lytle to make a report. See id. vol. III at 825-27. We do not believe that this evidence indicates that the Department was engaged in a cover-up. The record merely indicates that Lieutenant Coleman failed to order Mr. Lytle to submit a report. It does not suggest that Lieutenant Coleman, or anyone else, forbade, discouraged, or otherwise sought to prevent Mr. Lytle from filing reports that discussed the "dead or dying" comments either with Lieutenant Coleman or Chief Kitchings.

Having concluded that Mr. Lytle's interests are significantly diminished by his failure to pursue his concerns within the Department and by the lack of a reasonable factual basis for his allegations, we now consider the interests of Mr. Lytle's employer. As explained below, we conclude that those interests are

---

[3]     Under Kansas law, second degree murder (the offense that Mr. Lytle accused the officers of committing) is defined as "the killing of a human being committed: (a) [i]ntentionally; or (b) unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life." See Kan. Stat. Ann. § 21-3402 (1995).

18

entitled to substantial weight.

We first note that there is undisputed evidence that, by speaking with Mr. Berg and the press, Mr. Lytle breached general Department confidentiality rules and specific orders not to discuss the Wilson matter with persons outside the Department. See, e.g., id. vol. III at 1083-85 (recording no objections to the district court's statement that Mr. Lytle "admitted to Mr. Berg that he was under orders not to discuss the Wilson investigation"). Moreover, the City and Chief Kitchings presented affidavits from several officers and employees demonstrating the effect of Mr. Lytle's breach of confidentiality rule. According to these affidavits, after they learned of his statements to Mr. Berg and the press, Mr. Lytle's coemployees no longer trusted him with confidential information regarding the Wilson investigation, or any other sensitive police matter. See id. vol. I, at 90-123. For example, they stated that, "[a]fter the allegations it seemed that no one really wanted to work with [Mr.] Lytle due to no trust," id. at 90 (aff. of Mylain E. Anthis); that "[i]t was very hard to conduct telephone conversations with [Mr. Lytle] in the same room, in fear that I could be speaking about a case," id. at 92 (aff. of John Coleman); and that "I no longer trusted [Mr.] Lytle--nor did his fellow officers and employees," id. at 111 (aff. of Debbie Mann). According to these officers, this lack of trust significantly damaged department morale and made it more difficult to do their jobs. See, e.g., id. at 110 ("Morale in the

19

Department decreased significantly after [Mr.] Lytle's statements."), 116 (aff. of Michael McElroy) ("No one wanted to work with [Mr.] Lytle.  I had to tell the officers that they had to at least be polite to him.  In [l]aw [e]nforcement, officers have to work together and share information.").

This circuit has recognized the importance of confidentiality to the performance of police officers' responsibilities.   "Any breach of confidentiality . . . reflects negatively on an officer's ability and competence to perform his job, and each officer's competence affects the overall effectiveness of the department."  Melton, 879 F.2d at 715.   Moreover, personal loyalty and confidence are especially important among police officers, who are charged with ensuring public safety and who often must work together in life-and-death situations.  See Moore, 57 F.3d at 934 (The "need [for workplace harmony] is particularly acute in the context of law enforcement, where there is a 'heightened interest . . . in maintaining discipline and harmony among employees.'" quoting Wulf v. City of Wichita, 883 F.2d 842, 861 (10th Cir. 1989)); Koch, 847 F.2d at 1452 n.22 ("A number of cases have emphasized the heightened governmental interest in maintaining harmony among employees in the law enforcement context.").  These concerns are even greater in a relatively small department, where a minor disturbance in morale might loom large.  See Aplt's App. vol. I, at 105 ¶¶ 4, 5 (Tr. of dep. of Chief Kitchings, dated Nov. 20, 1995) (citing a

Haysville police force of 15 officers and a Haysville population of approximately 8,000); see also Moore, 57 F.3d at 934 (finding that "the small size of the department increased the likelihood and severity of disruption").

Although Mr. Lytle has not contested the defendants' evidence regarding the damaging effects of his breach of confidentiality on the Department, he does argue that these effects were not considered at the time of his dismissal. Mr. Lytle notes that Chief Kitchings did not mention the effect of the statements to Mr. Berg and the press in the letter of termination or in interviews with the news media after the discharge. See Aplt's App. vol. III, at 1019-22 (Tr. of interview with Judy Conklin, Haysville Pioneer, dated July 17, 1991); see also id. at 964-66 (Notice of termination, dated July 16, 1991). He further notes that Chief Kitchings later testified during his deposition that it was not until after the termination that he became aware of workplace disharmony. See id. vol. I at 144 (Tr. of dep. of Chief Kitchings dated September 12, 1994), vol. III at 944-46 (Tr. of dep. of Chief Kitchings, dated Oct. 12, 1995). According to Mr. Lytle, Chief Kitchings's failure to mention the effects of his breach of confidentiality until well after his termination precludes us from considering these effects in the Pickering balancing.

We are not persuaded by this argument. In weighing the government employer's interests, the primary consideration is the impact of the disputed

speech "on the effective functioning of the public employer's enterprise." Rankin, 483 U.S. at 388. Thus, rather than examining the explanation offered at a particular time by an individual decisionmaker such as Chief Kitchings, we must evaluate the effect of Mr. Lytle's statements on the Department as a whole. We acknowledge that, in certain instances, a decisonmaker's failure to mention certain adverse effects of the challenged speech may constitute some evidence those effects did not really occur or did not significantly impair the functioning of the government entity. See, e.g., Rankin, 483 U.S. at 388-89 (citing the decisionmaker's testimony that the disruption of office functions was not a consideration when the employee was terminated in support of the conclusion that "there is no evidence that [the speech] interfered with the efficient functioning of the office"). However, the fact that an official does not mention a particular adverse effect of the challenged speech in a termination letter or in various other statements concerning the challenged employment action does not necessarily preclude the government employer from invoking such an effect in articulating its interests under the Pickering inquiry.

In the instant case, Chief Kitchings's failure to specifically mention the effects of Mr. Lytle's breach of confidentiality rules on Department morale and efficiency does not diminish the weight we afford these effects in the Pickering inquiry. As we have noted, our decisions recognize that there is often a close

22

connection between a police department's confidentiality rules and the morale and effective functioning of the police force. See, e.g., Melton, 879 F.2d at 714. 1989). When he terminated Mr. Lytle, Chief Kitchings did mention the confidentiality rules, and the effects on morale and efficiency documented by the Department were foreseeable results of Mr. Lytle's violation of those rules.

For all of the foregoing reasons, we believe that the Pickering balancing tips in the defendants' favor. The only factor weighing on Mr. Lytle's side of the scales is Mr. Lytle's whistle blower status, and the significance of even that factor is substantially diminished by Mr. Lytle's failure to pursue his allegations within the Department and by the unreasonableness of his beliefs about government wrongdoing. Mr. Lytle's limited interests are far outweighed by the Department's interest in maintaining confidentiality and avoiding workplace disruption. Accordingly, the district court properly granted summary judgment to the defendants on Mr. Lytle's First Amendment claim.[4]

---

[4] Because we conclude that there was no First Amendment violation, we need not consider whether Chief is entitled to qualified immunity. See Martinez v. California, 444 U.S. 277, 28 Kitchings 4 (1980) ("[I]t is not necessary for us to decide any question concerning . . . immunity . . . because . . . [t]he first inquiry in [immunity analysis] . . . is whether the plaintiff has been deprived of a right secured by the Constitution and laws of the United States. The answer to that inquiry disposes of this case." (internal citations and quotations omitted).

## 2. State-Law Retaliatory Discharge

We also disagree with Mr. Lytle that the district court erred in granting the defendants summary judgment on the state-law retaliatory discharge claim. When exercising jurisdiction over pendent state claims, we must apply the substantive law of the forum state and reach the same decision we believe that state's highest court would, just as we would if our jurisdiction rested on diversity of citizenship. See United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938)).

In Palmer v. Brown, 752 P.2d 685 (Kan. 1988), the Kansas Supreme Court stated that a whistle blower retaliatory discharge claim requires, inter alia, proof "by clear and convincing evidence, . . . [that] a reasonably prudent person would have concluded the employee's co-worker or employer was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare. . . ." Id. at 690. In this case, the district court ruled that Mr. Lytle had not proven, by clear and convincing evidence, that a reasonable person would have concluded that the officers at the scene had committed second-degree murder. See Aplt's App. vol. III at 1134-35.

Mr. Lytle argues that the district court erred in applying a clear and convincing standard of proof. He suggests that the appropriate standard is preponderance of the evidence, citing Ortega v. IBP, Inc., 874 P.2d 1188 (Kan.

24

1994). Ortega held that a retaliatory discharge claim must be proven "by a preponderance of the evidence . . . [that is] clear and convincing in nature." Id. at 1198. Ortega added that "clear and convincing" is a quality, rather than a quantum, of proof. See id. According to Ortega, evidence "is clear if it is certain, unambiguous, and plain to the understanding. It is convincing if it is reasonable and persuasive enough to cause the trier of facts to believe it." Id.

Although Ortega involved retaliation for filing a workers compensation claim, rather than for whistle blowing, see id. at 1190, we believe that the Ortega standard governs this action. As the Ortega court stated, "[w]e find no justification for applying different standards of proof in whistle-blowing and workers compensation retaliatory discharge cases." Id. at 1194.

In discussing Mr. Lytle's First Amendment claim, we concluded that Mr. Lytle did not have reasonable grounds for believing there was wrongdoing, either by the officers at the scene or in the Department's internal investigation. We reached this conclusion based on the preponderance of the evidence standard that governs Mr. Lytle's First Amendment claim. See Grogan v. Garner, 498 U.S. 279, 286 (1991) (noting that civil actions are normally subject to the preponderance of the evidence standard). This standard does not incorporate the additional requirement that the quality of the evidence be "clear and convincing." See Santosky v. Kramer, 455 U.S. 745, 756 (1982) (describing "clear and

25

convincing" as an "intermediate standard of proof" — i.e., in between "preponderance of the evidence" and "beyond a reasonable doubt"). Because we do not think it was even "more probable than not," Black's Law Dictionary 1182 (6th ed. 1990), that a reasonable person could have believed there was government wrongdoing, we definitely do not think the evidence of government wrongdoing was "certain, unambiguous, and plain to the understanding." Ortega, 874 P.2d at 1198. Thus, we do not believe a reasonable jury could find in Mr. Lytle's favor on the state-law retaliatory discharge claim. See Anderson, 477 U.S. at 248. We agree with the district court that the defendants are entitled to summary judgment.

### III. CONCLUSION

For the foregoing reasons, we conclude that the defendants are entitled to summary judgment on Mr. Lytle's First Amendment and state-law retaliatory discharge claims. Accordingly, we AFFIRM the judgment of the district court.