**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 2, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

LANCE OLDRIDGE,

    Plaintiff - Appellee,

v.

ROBERT LAYTON; ANNA HATTER,

    Defendants - Appellants,

and

CITY OF WICHITA, KANSAS;
GORDON RAMSAY; WANDA GIVENS;
JOSE SALCIDO,

    Defendants.

No. 22-3284
(D.C. No. 6:21-CV-01284-EFM-KGG)
(D. Kan.)

LANCE OLDRIDGE,

    Plaintiff - Appellee,

v.

WANDA GIVENS; JOSE SALCIDO,

    Defendants - Appellants,

and

CITY OF WICHITA, KANSAS; ROBERT
LAYTON; GORDON RAMSAY; ANNA
HATTER,

    Defendants.

No. 23-3070
(D.C. No. 6:21-CV-01284-EFM-KGG)
(D. Kan.)

_____

### ORDER AND JUDGMENT[*]
_____

Before **HARTZ**, **TYMKOVICH**, and **ROSSMAN**, Circuit Judges.
_____

Lance Oldridge sued the City of Wichita and several of its employees after his dismissal from the police department, alleging First Amendment retaliation. The government defendants appeal the district court's denial of qualified immunity. We accept as true the district court's determination of the facts relevant to qualified immunity at this stage of the case. And the district court's findings at this stage support Oldridge's claim that he was terminated for exercising his First Amendment rights and that those rights were clearly established. His claims based on retaliatory investigation, however, are not supported by clearly established law, so the defendants to that claim are entitled to qualified immunity.

Accordingly, we affirm in part and reverse in part, and remand for further proceedings.

## I. Background

In its order denying qualified immunity, the district court found the following facts to be in dispute.

_____

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Lance Oldridge was a longstanding Wichita Police Department (WPD) veteran who was assigned to the Professional Standards Bureau and later the WPD academy. He was terminated in 2019 after a series of disputes with his supervisors.

The controversy arose as follows. In 2019, the Wichita Eagle published an article quoting statements that WPD Chief Gordon Ramsay had made in a deposition in a case related to questionable police practices. According to that article, Chief Ramsay was concerned that police officers—including, potentially, Oldridge—had engaged in misconduct during criminal investigations. The article reported that Chief Ramsay had testified that he had reassigned several officers as a result. Although not named directly, those officers impliedly included Oldridge.

In response to the article, Chief Ramsay issued a public statement claiming that the reassigned officers "committed no legal or WPD internal violations." Order at 3.

Based on that public statement, Oldridge believed that Chief Ramsay had been caught in a lie: he had testified in his deposition that police officers had committed WPD violations, but he had said the opposite in the public statement issued after the deposition. Accordingly, Oldridge delivered a dossier containing Chief Ramsay's deposition, his public statement, and copies of Kansas statutes pertaining to false communications to the Sedgwick County District Attorney. This supposedly provided a basis to support a prosecution of Chief Ramsay for violating Kansas law.

The district attorney, after reviewing the materials, sent Oldridge an email opining that Chief Ramsay had not committed a crime. Undeterred, Oldridge sent a

3

similar packet to the sheriff, although he apprised the sheriff of the district attorney's negative review of his complaint. After consulting with the district attorney, the sheriff informed Oldridge that he believed Chief Ramsay had not committed perjury and that he would not launch an investigation. He also contacted Chief Ramsay to inform him of Oldridge's efforts.

Chief Ramsay told his staff about Oldridge's accusations. WPD deputy chiefs Jose Salcido, Anna Hatter, and Wanda Givens met with the district attorney to discuss the matter. After that meeting, they decided that Deputy Salcido and Deputy Givens would request an internal investigation into Oldridge's conduct.

At the beginning of the investigation, Oldridge was told that he had failed to inform the sheriff of his prior communications with the district attorney. But Oldridge produced documents showing that this accusation was false, since he had in fact informed the sheriff of his prior correspondence with the district attorney. The department nonetheless suspended Oldridge without pay pending the investigation and took the unusual step of confining him to his residence during the workweek.

Although Oldridge's documents refuted the investigation's original basis, the WPD amended its investigation to add a general allegation that he had engaged in conduct intended to discredit the WPD. At the investigation's conclusion, Deputy Hatter recommended terminating Oldridge. Her memorandum to City Manager Brandon Layton discussed Oldridge's statements to the district attorney and the sheriff, but suggested that the basis for termination centered on his allegedly

4

derogatory and debasing statements about the police chief to his coworkers, his untruthfulness, and his breach of a prior confidentiality agreement.

Oldridge filed a grievance protesting this outcome, which led to an arbitrator's recommendation of reinstatement. Layton rejected that recommendation and terminated Oldridge. After Oldridge's appeal, a state court affirmed the termination decision, finding it was supported by substantial evidence and was not arbitrary and capricious.

Oldridge filed this suit in federal court, alleging claims under the First and Fourteenth Amendments, Title VII, and the Kansas Act Against Discrimination. The district court denied summary judgment on Oldridge's First Amendment retaliation claims. The defendants only challenge the constitutional claims in this interlocutory appeal.

## II. Analysis

The defendants contend the district court erred in denying their claim to qualified immunity.

### A. Legal Framework

#### 1. Qualified Immunity

"A § 1983 defendant's assertion of qualified immunity is an affirmative defense that creates a presumption that the defendant is immune from suit." *Truman v. Orem City*, 1 F.4th 1227, 1235 (10th Cir. 2021) (brackets internal quotation marks omitted). The doctrine is designed to shield "officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a

5

reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation marks omitted). To overcome this presumption, plaintiffs must show "(1) the officers' alleged conduct violated a constitutional right, and (2) it was clearly established at the time of the violation, such that every reasonable official would have understood, that such conduct constituted a violation of that right." *Reavis v. Frost*, 967 F.3d 978, 984 (10th Cir. 2020) (internal quotation marks omitted). A plaintiff can show that the right was clearly established by reference to a Supreme Court or Tenth Circuit opinion, or to the established weight of authority from other circuits. *Truman*, 1 F.4th at 1235. "[T]he contours of the right must be sufficiently clear so that a reasonable official would understand that what he is doing violates that right," but we need not undertake a "scavenger hunt for prior cases with precisely the same facts." *Id.* (brackets omitted).

Ordinarily, we only have jurisdiction to hear appeals from final judgments, but our precedents recognize a narrow exception for orders denying qualified immunity. *Estate of Booker v. Gomez*, 745 F.3d 405, 409 (10th Cir. 2014). "Under this limited jurisdiction, we may review: (1) whether the facts that the district court ruled a reasonable jury could find would suffice to show a legal violation, or (2) whether that law was clearly established at the time of the alleged violation." *Id.* at 409 (internal quotation marks omitted). "[I]f a district court concludes that a reasonable jury could find certain specified facts in favor of the plaintiff, the Supreme Court has indicated we usually must take them as true—and do so even if our own *de novo* review of the

record might suggest otherwise as a matter of law." *Id.* at 409–410 (citing *Roosevelt-Hennix v. Prickett*, 717 F.3d 751, 753 (10th Cir. 2013)).

### 2. First Amendment Retaliation

"A public employer may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." *Helget v. City of Hays*, 844 F.3d 1216, 1221 (10th Cir. 2017) (internal quotation marks omitted). Under the First Amendment, a public employee's speech is entitled to protection from employer retaliation if both: (1) the "employee spoke as a citizen on a matter of public concern," rather than "pursuant to their official duties"; and (2) the employer did *not* have "an adequate justification for treating the employee differently from any other member of the general public." *Lane v. Franks*, 573 U.S. 228, 237 (2014) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)). Ultimately, courts must "balanc[e]… the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 236 (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)) (second alteration in original).

Our cases apply a five-step test under *Garcetti*/*Pickering* to determine whether dismissal of an employee violated the First Amendment:

> (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free

7

speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Helget*, 844 F.3d at 1221.  "The first three steps concern questions of law for the courts, and the last two concern questions of fact."  *Id.* at 1222.

Under *Helget*, our consideration is "whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests."  *Id.* at 1221.  "The only public employer interest that outweighs the employee's free speech interest is avoiding direct disruption, *by the speech itself*, of the public employer's internal operations and employment relationships."  *Id.* at 1222 (internal quotation marks omitted).  "A public employer need not show that the employee's speech *in fact* disrupted internal operations and employment relationships," but only that "the speech could *potentially* become so disruptive to the employer's operations as to outweigh the employee's interest in the speech."  *Id.* (brackets omitted).

### B.  Application

#### 1.  Layton/Hatter

Layton and Hatter contend the district court erred in concluding that clearly established law would have notified them that Oldridge's termination violated the First Amendment.  We disagree.  The district court correctly concluded that a reasonable

8

jury could find that Oldridge's free speech interests outweighed the defendants' interest in avoiding disruption.

The parties only dispute the district court's application of the second and third *Garcetti/Pickering* factors.

Applying the second factor, the district court concluded that Oldridge's statements to the DA and sheriff about Chief Ramsay's alleged perjury were on a matter of public concern. We agree. It is well-established under our precedents that speech about alleged criminal behavior by law enforcement is of public concern. In *Wulf v. City of Wichita*, for example, we concluded that a letter written by a police officer to the Kansas Attorney General alleging that WPD leaders violated the First Amendment and Kansas law was on a matter of public concern. 883 F.2d 842, 857 (10th Cir. 1989).

Applying the third factor, the district concluded that Layton and Hatter had provided no evidence to suggest that their interest in promoting efficiency outweighed Oldridge's interest in free speech. We agree. As the district court explained, (1) the defendants "failed to perform any sort of factual analysis whatsoever in support of their naked assertion that Plaintiff's statements to the DA and the Sheriff would disrupt efficiency in the WPD," and (2) since Oldridge's "statements were made privately to the DA and the Sheriff," there was minimal potential for disruption. Order at 15.

It is true we afford greater latitude to law enforcement in dismissing employees, since "loyalty and confidence among employees is especially important in a law

enforcement setting." *Helget*, 844 F.3d at 1223. But even law enforcement employers must show evidence of potential disruption to internal operations when dismissing an employee due to speech about a matter of public concern. For example, in *Wulf*, we concluded that provoking "idle gossip and talk" across the department was insufficient to show disruption to internal operations, as were "purely speculative allegations of disruption." *Id.* at 861-862. Layton and Hatter pointed to no evidence that Oldridge's statements would have provoked actual disruption to WPD operations—let alone that their interests in preventing disruption *outweighed* Oldridge's interest in free speech.

Accordingly, the district court did not err in finding that the disputed facts could support a First Amendment violation.

Defendants contend nonetheless that a First Amendment violation was not clearly established in these circumstances. They point to our decision in *Lytle v. City of Haysville*, arguing that the balancing test weighs in favor of the government because Oldridge did not pursue internal reporting mechanisms and his statements were not objectively reasonable. 138 F.3d 857, 861 (10th Cir. 1998). In *Lytle*, we considered whether a dismissed police officer's interest in free speech outweighed disruption to the police department caused by his coworkers "no longer trust[ing] him with confidential information regarding [an] investigation, or any other sensitive police matter." *Id.* at 867. In that case, the plaintiff went to the local media with a claim that officers had committed murder while on the job, and the claim was then published. The plaintiff had not made the allegations internally at all. We explained that the plaintiff's

10

interests were "significantly diminished by his failure to pursue his concerns within the Department and by the lack of a reasonable factual basis for his allegations," while his employer's interests were "entitled to substantial weight." *Id.* It is therefore inadequate, under *Lytle*, for an employer to simply show that the employee's interests were diminished—the employer also must show that its own interests outweighed that of the employee. The defendants refer to negative "effects on WPD morale and efficiency [that] were foreseeable results" of Oldridge's speech, Aplt. Br. at 48, but unlike the *Lytle* defendants, they offer no evidence showing Oldridge's non-public allegations generated negative effects on morale and efficiency. *See Lytle*, 138 F.3d at 867. Absent evidence of disruption, their argument amounts to nothing more than "purely speculative allegations" of disruption, which are insufficient to outweigh Oldridge's free speech interest. *Wulf*, 883 F.2d at 862.

According to the district court, a reasonable jury could conclude that City Manager Layton fired Oldridge at the recommendation of Hatter in retaliation for his protected speech. Order at 5. Under the facts that the district court found to be in dispute, Wichita's interest in employee discipline was outweighed by Oldridge's interest in free speech under clearly established law. The district court therefore did not err in denying qualified immunity to defendants Layton and Hatter.

### 2. *Givens/Salcido*

Givens and Salcido appeal the district court's denial of their qualified immunity. The district court found that their role in Oldridge's dismissal was more limited than that of Layton and Hatter. They did not make the decision to dismiss Oldridge, but they

11

helped launch the investigation that led to his dismissal.  Oldridge alleges that they launched this investigation in retaliation of his protected speech.

Assuming this constitutes a constitutional violation, Oldridge must point to clearly established precedents that forbid analogous behavior, such that "a reasonable official would understand that what he is doing violates that right."  *Truman*, 1 F.4th at 1235.  While it is clearly established that dismissing an employee constitutes improper First Amendment retaliation, *see Wulf*, 883 F.2d at 863, none of our precedents clearly hold that launching an investigation with a retaliatory motive constitutes First Amendment retaliation.  Since Givens and Salcido were not responsible for firing him, and instead merely instigated an investigation that eventually led to his termination, they are entitled to qualified immunity.

Oldridge argues that he can overcome Givens and Salcido's immunity since they "set in motion a series of events that the defendants knew or reasonably should have known would cause others to deprive the Plaintiff of his constitutional rights."  Aple. Br. at 35 (quoting *Trask v. Franco*, 446 F.3d 1036, 1046 (10th Cir. 1994)).  In *Trask*, we considered a § 1983 suit against probation officers who visited the home of an offender recently discharged from probation.  The offender refused to open the door when the officers knocked, so the officers called in law enforcement backup.  When the law enforcement officers arrived, they arrested the offender's boyfriend and charged him with obstruction of an officer.  The issue on appeal was whether the probation officers were liable for the law enforcement officers' arrest of the felon's boyfriend.  We acknowledged that the probation officers "caused" the boyfriend's arrest, but we noted

12

that the boyfriend's appearance at the door bearing knives and his false statement to the officers were "superseding acts" that potentially limited the probation officers' liability. *Id.* at 1046-1047. We therefore remanded the case to the district court to determine "how much of Mr. Trask's unlawful detention and arrest were proximately (or legally) caused by the probation officers' conduct." *Id.* at 1047.[1]

We agree with Oldridge that a § 1983 defendant can be liable for the foreseeable consequences of his actions, but it does not reduce his burden to show that his rights were clearly established at the time of the violation. To overcome qualified immunity, "[t]he 'clearly established' standard also requires that the legal principle clearly prohibit the officer's conduct *in the particular circumstances before him*," which requires "a high degree of specificity." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (Thomas, J.) (emphasis added and internal quotation marks omitted). The facts of *Trask* are too dissimilar to this case for it to be authoritative in the qualified immunity context. The defendants in *Trask* were probation officers who called for law enforcement backup when visiting a felon's home—a decision that was highly likely to result in an arrest. None of the claims involved First Amendment retaliation at all. That fact pattern is far removed from Givens and Salcido's decision to launch an investigation into Oldridge's alleged workplace misconduct.

---

[1] The defendants criticize the district court's reliance on *Van Deelen v. Johnson*, 497 F.3d 1151, 1155–1156 (10th Cir. 2007) (Gorsuch, J.). But as Oldridge notes, the district court merely cited this case for its enunciation of the *Garcetti/Pickering* factors, rather than for its factual applicability.

Since Oldridge has not offered authorities showing that launching an investigation with retaliatory intent violates the First Amendment, we reverse the district court's denial of Givens' and Salcido's qualified immunity.

### III.  Conclusion

We affirm the district court's denial of Ms. Hatter's and Mr. Layton's qualified immunity and we reverse the district court's denial of Ms. Givens' and Mr. Salcido's qualified immunity.

Entered for the Court


Timothy M. Tymkovich
Circuit Judge