**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENH CIRCUIT**

PAUL CAMPBELL FIELDS,

      Plaintiff - Appellant,

v.

CITY OF TULSA; CHARLES W.
JORDAN, individually and in his official
capacity as Chief of Police, Tulsa Police
Department; ALVIN DARYL
WEBSTER, individually and in his
official capacity as Deputy Chief of
Police, Tulsa Police Department,

      Defendants - Appellees.

No. 12-5218

---

AMERICAN CIVIL LIBERTIES UNION;
AMERICAN CIVIL LIBERTIES UNION OF
OKLAHOMA,

      Amici Curiae.

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**
**(D.C. No. 4:11-CV-00115-GKF-FHM)**

Robert Joseph Muise, American Freedom Law Center, Ann Arbor, Michigan, (Scott
Wood, Wood, Puhl & Wood, PLLC, Tulsa, Oklahoma, and Erin Elizabeth Mersino,

Thomas More Law Center, Ann Arbor, Michigan, with him on the briefs) for Plaintiff – Appellant.

Gerald M. Bender (David O'Meilia, City Attorney, and Brandon J. Burris with him on the brief), Tulsa, Oklahoma, for Defendants – Appellees.

Daniel Mach and Heather L. Weaver, American Civil Liberties Union Foundation, Washington, D.C., Jennifer Lee, American Civil Liberties Union Foundation, New York, New York, and Ryan Kiesell and Brady Henderson, American Civil Liberties Union of Oklahoma, Oklahoma City, Oklahoma, filed an amicus curiae brief for Defendants – Appellees.

---

Before **HARTZ**, **TYMKOVICH**, Circuit Judges, and **JACKSON**, District Judge[*].

---

**HARTZ**, Circuit Judge.

---

Paul Fields, a captain in the Tulsa, Oklahoma, police department, filed a civil-rights complaint under 42 U.S.C. § 1983 against the City of Tulsa; Charles Jordan, the Chief of Police; and Alvin Daryl Webster, the Deputy Chief of Police (collectively, Defendants). The suit challenged his punishment for objecting to an order requiring him either to attend or to order subordinates to attend a law-enforcement appreciation event hosted by the Islamic Society of Tulsa. (We refer to this order as the "Attendance Order.") He claimed that the punishment violated the First Amendment prohibitions against impairing the rights of free exercise of religion and of association as well as the prohibition against the establishment of religion. He also raised an equal-protection

---

[*] The Honorable R. Brooke Jackson, United States District Judge for the District of Colorado, sitting by designation.

2

claim. He later sought to amend his complaint to add a claim that his freedom of speech was violated when he suffered retaliation for bringing this lawsuit and a claim that he was denied rights protected by the Oklahoma Religious Freedom Act (ORFA). The United States District Court for the Northern District of Oklahoma denied leave to amend and ultimately granted summary judgment for Defendants.

We have jurisdiction under 28 U.S.C. § 1291 and affirm. First, the Attendance Order did not burden Fields's religious rights because it did not require him to violate his personal religious beliefs by attending the event; he could have obeyed the order by ordering others to attend, and he has not contended on appeal that he had informed his supervisors that doing so would have violated his religious beliefs. Second, the order did not violate the Establishment Clause because no informed, reasonable observer would have perceived the order or the event as a government endorsement of Islam. Third, the order did not burden Fields's right of association because it did not interfere with his right to decide what organizations to join as a member. Fourth, Fields's equal-protection claim duplicates his free-exercise claim and fails for the same reason. And fifth, the district court did not abuse its discretion in denying Fields's motion to amend the complaint to add ORFA and free-speech retaliation claims because the amendment would have been futile. He has provided no reason why his ORFA claim could succeed when his religion claims under the First Amendment do not. And his retaliation claim would fail because the interests of the Tulsa Police Department (TPD) as an employer outweighed Fields's free-speech interests in filing his suit.

3

## I.     BACKGROUND

The material facts are undisputed.  At the time of the events in question, Captain Fields commanded 26 officers and five supervisors.  The chain of command above him was Major Julie Harris, Deputy Chief Webster, and Chief Jordan.

For more than 23 years TPD had engaged in community policing, in which it participated in events to build trust with the local community.  As part of that mission, TPD accepted requests to attend about 3,500 community events between 2004 and 2011.  Some 327 of those events were at religious venues or institutions affiliated with religious faiths, and between 2009 and 2011 there were an additional 25 meetings attended by community-education officers at religious venues or sponsored by religious organizations.

In 2010 the FBI notified the Islamic Society of a threat against it.  Over the following months TPD worked to protect the mosque and the school next door.  When the threat was over, the Islamic Society decided to hold an event to thank TPD for its help.  During the planning stages, Webster advised Sheryl Siddiqui, a representative of the Islamic Society, that TPD officers might not be interested in or willing to tour the mosque or discuss Islam and that the invitation should make discussion of any topic discretionary.

Webster announced the event and requested RSVPs at a staff meeting in late January 2011.  On February 16, Webster approved distribution within TPD of an e-mail from the Islamic Society that contained a flyer for the event and again requested RSVPs.

The flyer invited all Tulsa law enforcement to a "Law Enforcement Appreciation Day" to be held on Friday, March 4. Aplt. App., Vol. I at 193. It read:

> Casual Come & Go Atmosphere
> Come enjoy a Buffet of American & Ethnic Foods:
> Brownies & baklava
> Baked chicken & Chicken Tikka Masala
> Lots more!
> Mosque Tours: 15 minutes or an hour- it's up to you!
> Meet Local Muslims & Leadership
> Watch the 2-2:45pm weekly congregational prayer service
> Presentations upon request: beliefs, human rights, women
> All questions welcome!

*Id.*

When there were no volunteers by late afternoon on February 17, Major Harris forwarded an e-mail from Webster ordering each shift to send two officers and a supervisor or commander to the event. The e-mail read:

> We are directed by DCOP Webster to have representatives from each shift—2nd, 3rd and 4th to attend. Here is his note to me:
>
> Re that attached, I have advised Ms. Siddiqui to expect small-group visits at [11:00, 1:30, and 4:30]. Please arrange for 2 officers and a supervisor or commander from each of your shops to attend at each of those times. They can expect to be at the facility for approximately 30 minutes but can stay longer if they wish.

*Id.* at 194. Webster testified that he chose those times to ensure that officers would not have to be present during the 2:00 to 2:45 p.m. prayer service unless they wanted to stay for it.

That evening, Fields sent an e-mail to Harris, Webster, Jordan, his lawyer, and ten other people, including several subordinates. The e-mail read:

5

Major,

I'm a little confused in reference to DCOP Webster's directive to send 2 officers and at least 1 supervisor or shift commander from 2nd, 3rd, and 4th, [sic] shifts to the Islamic Society of Tulsa Law Enforcement Appreciation Day. Initially, this was to be on a voluntary basis, however now it is a directive. What has changed?

I have no problem with officers attending on a voluntary basis; however, I take exception to **requiring** officers to attend this event. Past invitations to religious/non-religious institutions for similar purposes have always been voluntary. *I believe this directive to be an unlawful order, as it is in direct conflict with my personal religious convictions, as well as to be conscience shocking.*

This event is not a police "call for service", [sic] which I would readily respond to, as required by my Oath of Office. Instead, it is an invitation to, [sic] tour a Mosque, meet Muslim Leadership, watch a congregational prayer service, and receive "presentations on beliefs, human rights, and women." It is my opinion and that of my legal counsel, that *forcing me to enter a Mosque when it is not directly related to a police call for service is a violation of my Civil Rights.*

Please consider this email my official notification to the Tulsa Police Department and the City of Tulsa that *I intend not to follow this directive, nor require any of my subordinates to do so if they share similar religious convictions.*

*Id.* at 195 (italics added).

The next day, Webster responded to Fields in a three-page letter. He wrote that the Islamic Society was going to considerable pains to prepare a meal and tours for the event; that it would be unnecessary to order officers to attend if there were an adequate number of volunteers; that there would be an issue of disparate treatment and possible legal repercussions if TPD failed to attend; and that community policing events such as this one were as much a part of TPD's mission as direct calls for service. He wrote that

6

officers were "not required to participate in any religious ceremony, make any profession of faith, or express opinions on or sympathy with any religious belief system. They are simply expected to meet with members of the public who have expressed a desire to meet with them at a place of lawful assembly." *Id.* at 209. He repeated that Fields himself was not required to "participate or assist in any religious observance, make any expression of belief, or adopt any belief system." *Id.* And he urged Fields to reconsider and reminded him of the consequences of refusing to obey a lawful order, emphasizing that "refusal on the part of a leader, including extending that refusal to subordinate personnel, is particularly serious and injurious to good discipline." *Id.*

Fields responded by e-mail that he had conferred with counsel and that there was no need for him to reconsider. Webster then directed Fields to report to Jordan's office on Monday, February 21, so that they would have an opportunity to understand each other's positions before taking further action.

During the meeting Webster asked Fields if he had requested volunteers for the event. Fields said that he had but that there were none. Webster asked, "Are you prepared to designate two officers and a supervisor or yourself to attend this event?" *Id.* at 173. Fields said, "No." *Id.* Webster asked, "If ordered?" *Id.* Fields responded, "No, Chief, I am not." *Id.* Moments later Webster served Fields with papers notifying him that because of his refusal to follow a direct order he was being transferred immediately to another division and would be investigated by TPD Internal Affairs. The media began covering the story only hours later.

Although the Attendance Order was still in effect, Harris told Fields's former shift the next day that she would not make the event mandatory but would still like volunteers. On February 23, Fields filed his first complaint in this lawsuit, naming Webster as the only defendant. On February 24 (three days after Fields's transfer), Harris forwarded to the supervisors under Fields's command and others an e-mail from Webster that read, "We have more volunteers than we RSVP'd. No detailing will be necessary." *Id.* at 199.

When the event was held on March 4, about 150 TPD officers attended, far more than the 27 anticipated in the RSVP from TPD. Members of the sheriff's office, district attorney's office, and FBI had been invited and also attended. Of the nine shifts that had been asked to provide officers, Fields's former shift was the only one that did not send anyone. During the event, Islamic Society members discussed Islamic beliefs, Mohammed, Mecca, and why and how Muslims pray; they showed officers a Koran; and they showed the officers Islamic books and pamphlets that were for sale and encouraged the officers to buy them. At least one TPD officer stayed for the prayer service and was photographed observing it. After the event the Islamic Society posted on its website a photograph of officers sitting at a table with members of the mosque with the caption, "Discover Islam Classes for Non-Muslims." *Id.* at 206.

On March 10, Captain Luther Breashears of TPD Internal Affairs (IA) sent an e-mail to Fields notifying him that "Chief Chuck Jordan has requested IA to conduct an administrative investigation in regards to your refusal to attend and refusal to assign

8

officers from your shift, who shared your religious beliefs, to attend" the Islamic Society event. *Id.* at 200.

Two weeks later, Fields amended his complaint, this time naming the City of Tulsa, Chief Jordan, and Deputy Chief Webster as defendants, individually and in their official capacities. It alleged that they had violated his First Amendment right to free exercise of religion, the Establishment Clause, his right to freedom of association, and the Equal Protection Clause. Although largely irrelevant to the claims, the complaint also contained five pages of allegations about "shariah-adherent" Islam and the Islamic Society, with references to "jihad" and the Muslim Brotherhood. *Id.* at 17–21. Fields sought damages, a declaration that his rights had been violated, an injunction prohibiting the enforcement of the policies that led to his punishment, and the expungement from his personnel file of all references to the incident.

TPD Internal Affairs completed its investigation of Fields on April 6, 2011. The report summarized the events that led to the investigation; the media coverage; and interviews with Webster, Harris, four of Fields's subordinate supervisors, and Fields himself. Webster said that he had thought each shift would respond to the Attendance Order by seeking volunteers, that Fields had misunderstood the order, and that Fields did not identify which of his religious convictions would be violated. He also said that when Fields publicized his intention not to follow the order and not to require his subordinates to do so, Fields had committed an act of insubordination unprecedented in TPD history, which was corrosive of both internal discipline and the public's respect for the

department. Fields's subordinate supervisors said that Fields had never asked for volunteers or ordered anyone to follow the order. Fields said in his interview that he had discussed the order with two of his subordinates, who indicated that they were uncomfortable with the order but did not say that they shared his religious convictions; that he had never told his superiors which of his religious convictions would be violated by the order; that he sent the e-mail as he did to comply with his duty to alert TPD and the City to an order that he and his counsel believed to be unlawful; and that he had no opportunity to comply with the order because he had asked for clarification and shortly afterward the order was made voluntary.

On June 9, 2011, Chief Jordan issued the personnel order setting forth Fields's punishment. It read:

> [Y]ou are suspended without pay for 80 hours/10 days, your regular days off have been included in this timeframe. This action is taken as a result of your violation of the following Tulsa Police Department Policies, Rules & Regulations:
>
> You are hereby suspended for 40 hours for the following policy violation:
> - Rules and Regulation #6: Duty to be Truthful and Obedient, which states in part: *"Employees shall obey lawful orders from an officer or employee, verbal or written in nature, including any relayed from a superior by an employee of the same or lesser rank."*
>
> Specifically, you failed to follow the directives of your chain of command regarding furnishing officers to attend the "Law Enforcement Appreciation Day", [sic] held March 4, 2011.
>
> You are hereby suspended for 40 hours for the following policy violation:
> - Rules and Regulation #8: Conduct Unbecoming an Officer or Police Employee, which states in part: *"Employees shall not commit any act or indulge in any behavior, on or off duty, which tends to bring*

10

> *reproach or discredit upon the Department. They shall not engage*
> *in any conduct that is considered unbecoming an officer or employee*
> *which might be detrimental to the service."*

> Specifically, your actions and writings that were made public brought
> discredit upon the department related to furnishing officers to attend the
> "Law Enforcement Appreciation Day", [sic] held March 4, 2011.

*Id.* at 202. The order also stated that further violations would lead to more severe disciplinary action, including dismissal, and that Fields would not be considered for promotion for at least a year. Fields's temporary transfer was made permanent on the day the order issued. Also, he was assigned to the graveyard shift, and the personnel orders setting forth his punishment and transfer became a part of his permanent record.

Almost a year after issuing the order, Jordan testified at a May 2012 grievance hearing that the "actions and writings" for which Fields was punished had been statements by Fields's attorney that accused Jordan of assisting in "global jihad" and accused TPD of trying to force Fields to go to a mosque for a religious service and to engage in the faith of Islam. *Id.* at 265–66. On June 16, 2012, Fields sought to amend his complaint again, this time to add claims alleging that Defendants had violated his rights under the Oklahoma Religious Freedom Act and that they had violated his First Amendment right to freedom of speech by retaliating against him for filing this lawsuit. The district court denied Fields leave to amend, concluding that amendment would be futile because his new allegations failed to state a claim for relief.

In August 2012 the parties filed cross-motions for summary judgment. The district court granted summary judgment for Defendants, concluding that Fields's rights

had not been violated because "the directive at issue permitted him to assign others to attend rather than attend himself." *Id.*, Vol. IV at 1164.

## II.    DISCUSSION

Fields appeals the district court's grant of summary judgment for Defendants on his free-exercise-of-religion, establishment-of-religion, freedom-of-association, and equal-protection claims; and its denial of leave to amend his complaint to include his Oklahoma Religious Freedom Act and First Amendment retaliation claims.

### A.    Summary Judgment

"We review the district court's grant of summary judgment de novo, applying the same standards that the district court should have applied." *Merrifield v. Bd. of Cnty. Comm'rs*, 654 F.3d 1073, 1077 (10th Cir. 2011) (internal quotation marks omitted). Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Id.* (internal quotation marks omitted).  A dispute is genuine "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way," and it is material "if under the substantive law it is essential to the proper disposition of the claim." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013) (internal quotation marks omitted). When considering a motion for summary judgment, "[w]e examine the record and all reasonable inferences that might be drawn from it in the light most favorable to the non-moving party." *Merrifield*, 654 F.3d at 1077 (internal quotation marks omitted).

### 1. Free Exercise of Religion

Fields argues that Defendants violated his right to the free exercise of religion because the Attendance Order required him to order his subordinates to attend the Islamic Society event and/or to attend the event himself, he refused to comply with it, and he was punished as a result. The district court granted summary judgment for Defendants on the ground that no reasonable jury could find that the Attendance Order required Fields personally to attend the event. We agree.

To establish a free-exercise claim, Fields must show that the government has placed a burden on the exercise of his religious beliefs or practices. *See Bauchman v. W. High Sch.*, 132 F.3d 542, 557 (10th Cir. 1997). "A plaintiff states a claim [that his] exercise of religion is burdened if the challenged action is coercive or compulsory in nature." *Id.*

The Attendance Order created no improper burden. Webster ordered Fields to "arrange for 2 officers and a supervisor or commander" from his shift to attend the Islamic Society event. Aplt. App., Vol. I at 194. Fields responded that the order "requir[ed] officers to attend this event," and, "forc[ed him] to enter a Mosque." *Id.* at 195 (bold omitted). But his view of the order was wrong, not even a reasonable construction of the order. As the district court pointed out, the order did not require him to attend because he could assign others to do so. And he has not claimed on appeal that he ever told his superiors that ordering others to attend (possibly in violation of their beliefs) would violate *his* religious beliefs. Although he made clear that he thought that

13

ordering others to attend would be unconstitutional, that is a legal objection, not a religious one. The Attendance Order did not burden Fields's free exercise of religion.

Because the Attendance Order did not violate Fields's right to the free exercise of religion, TPD could lawfully punish him for violating it. An invalid religious objection to an order that does not burden your free exercise of religion does not immunize you from punishment for violation of the order.

In his appellate briefs, however, Fields may be making an additional free-exercise argument. Although not crystal clear on this point, the briefs may be asserting that even if the Attendance Order was valid, TPD's *reason* for imposing punishment, or at least the reason for the severity of the punishment, was the religious nature of Fields's objection to the order—that is, someone who refused to obey the Attendance Order for purely secular reasons, or no reason whatsoever, would not have been punished or would have received a lesser punishment. Moreover, there is evidence in the record that would support this assertion. Some statements by TPD officials suggest that at least part of the motive for punishing Fields was that he posed a religious objection to the order and refused to attend the mosque event on religious grounds.

The problem with this argument is that it was not preserved in the district court. The reason the court and Defendants did not address the matter is that they did not perceive that it had been raised by Fields's pleadings. The point is a subtle one. And Fields's complaints, as well as his summary-judgment memoranda, focused on attacking the Attendance Order. All his assertions that his punishment was improper appear to be

14

based on the alleged illegality of the order. Fields never claimed to be raising a "back-up" argument—the argument that his free-exercise rights were violated even if the order was lawful. Accordingly, we do not address this issue on appeal. *See R.W. Beck, Inc. v. E3 Consulting, LLC*, 577 F.3d 1133, 1145 (10th Cir. 2009) ("As a general matter, we do not consider issues that were not raised below." (internal quotation marks omitted)).

### 2.    Establishment of Religion

The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. The Supreme Court has not spoken with perfect clarity on the meaning of the Clause. But this circuit continues to follow the tripartite test set out in *Lemon v. Kurtzman*, 403 U.S. 602 (1971). *See Am. Atheists, Inc. v. Davenport*, 637 F.3d 1095, 1117 (10th Cir. 2010). Under that test, government action does not violate the Clause if (1) it has a secular purpose; (2) "its principal or primary effect [is] one that neither advances nor inhibits religion"; and (3) it does not "foster an excessive government entanglement with religion." *Id.* We interpret the first and second prongs of the *Lemon* test "in light of Justice O'Connor's endorsement test." *Id.* (internal quotation marks omitted). That is, we ask "'whether government's actual purpose is to endorse or disapprove of religion,'" and "'whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval.'" *Id.* (quoting *Lynch v. Donnelly*, 465 U.S. 668, 690 (1984) (O'Connor, J., concurring)). We evaluate the government's actions from the perspective of a reasonable

15

observer who is aware of the history, purpose, and context of the act in question. *See id.* at 1119.

Fields claims that TPD violated the Establishment Clause because the Attendance Order and the conduct of the event conveyed an official endorsement of Islam. But given the history, purpose, and context of the order, it would be unreasonable to conclude that the order or TPD's attendance at the event was such an endorsement.

TPD had engaged in community policing for more than two decades, participating in about 3,500 community events between 2004 and 2011. Of those events, more than 350 were held at religious venues or institutions or were sponsored by religious organizations of various faiths. After TPD spent months protecting the Islamic Society and the school next door from a terrorist threat, the Society decided to hold the "Law Enforcement Appreciation Day" event to thank TPD for its help. During the planning stages Webster advised the Society that officers might not be interested in or willing to tour the mosque or discuss Islam and that the invitation should make discussion of any topic discretionary. The flyer for the event announced a "Casual Come and Go Atmosphere" and offered attendees refreshments and an opportunity to meet the mosque's leadership, tour the mosque, watch a prayer service, and learn about Islamic observance and beliefs—but only upon request. Aplt. App., Vol. I at 193. After seeking volunteers and receiving none (albeit well in advance of the event), Webster ordered each shift to arrange for officers to attend the event for 30-minute visits at times selected so that officers would not have to be present during prayer services unless they chose to be.

When Fields objected to the Attendance Order, Webster clarified in a letter that officers were "not required to participate in any religious ceremony, make any profession of faith, or express opinions on or sympathy with any religious belief system. They are simply expected to meet with members of the public who have expressed a desire to meet with them at a place of lawful assembly." *Id.* at 209. Ultimately, about 150 TPD officers attended the event voluntarily, along with members of the sheriffs' office, district attorney's office, and FBI.

Failure by TPD to attend would have treated the Islamic community differently from other religious organizations that had sought TPD attendance at prior events. That concern was foremost among the purposes for the order that Webster expressed when he first asked Fields to reconsider his objection. Webster wrote:

> In the past . . . I and other personnel have either been detailed or strongly encouraged to attend community outreach events at the Jewish Community Center, churches in North Tulsa to reach out to African American residents, and churches in East Tulsa to reach out to Hispanic residents. . . .
>
> . . . .
>
> We have detailed personnel to protect the rights of Westboro Baptist Church members to protest and to simultaneously protect the rights of their targets to assemble at religiously themed funerals. *Were we to pick and choose which belief systems we would associate ourselves with as an agency or which religious venues we would enter for secular or ceremonial purposes and which we would not, then I believe there would be an issue of disparate treatment that would reflect dishonor upon us all and possibly subject the Police Department to liability.*

*Id.* at 207–08 (emphasis added).

17

Fields insists, however, that this event was unique because it involved Islamic proselytizing. He points to evidence that the event was intentionally held on Friday, which is Islam's holy day, and that during the event Islamic Society members discussed their religious beliefs and encouraged the officers to buy Islamic books and pamphlets on display. At least one officer was photographed at prayer services and the Islamic Society website later posted a photograph of officers at a table with mosque members with the caption "Discover Islam Classes for Non-Muslims." *Id.* at 206.

We are not persuaded. No informed reasonable person could view the purpose or effect of TPD's attendance at the event as suggesting that Islam is a preferred religion. Officers attending the event were not required to attend a religious service (and the timing of visits ensured that no officer would be required to be there during a service), read Islamic literature, or even discuss Islam. Those who wished to learn more about Islam could do so. The Establishment Clause does not prohibit governmental efforts to promote tolerance, understanding, and neighborliness. There is no evidence in the record of any attempts to convert officers to Islam, as opposed to providing information. And in any event, if perhaps some representatives of the Center crossed the line, there is nothing that would suggest to a reasonable observer that such conduct had received governmental endorsement.

On appeal Fields may be arguing that his punishment violated the Establishment Clause regardless of whether the Attendance Order and the conduct of the event did so. But as with his (possible) argument on appeal that his punishment violated the Free

18

Exercise Clause even if the Attendance Order did not, this claim was not preserved below. We therefore need not consider it.

### 3. Freedom of Association

Fields contends that the City, Jordan, and Webster violated his right to freedom of association by punishing him for objecting to the Attendance Order, which, he claims, compelled an association contrary to his religious beliefs. This claim fails because there was no interference with his freedom of association.

The First Amendment protects the "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). And the "[f]reedom of association . . . plainly presupposes a freedom not to associate." *Id.* at 623. Fields, however, has not shown any impairment of his freedom of association. He does not assert that he has been prevented from engaging in any association. His complaint is that he was being forced to associate with the Islamic Society. But the Attendance Order did not require him to attend the event, much less join the Islamic Society or endorse its faith or message in any way.

In *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47 (2006), the Supreme Court held that requiring law schools to allow military recruiters on campus did not violate the schools' freedom of association because they were not being required to accept recruiters as "members"—but merely as "outsiders" whose presence

19

served only "the limited purpose of trying to hire students." *Id.* at 69. Here, Fields was never required to be anything more than an outsider with respect to the Islamic Society.

### 4. Equal Protection

Fields asserts an equal-protection claim premised on the violation of his fundamental right to the free exercise of religion. In the district court and on appeal, however, he has not distinguished this claim from his free-exercise claim, never devoting more than a page to the claim in any pleading. Because we hold that TPD did not violate Fields's free-exercise rights and his equal-protection claim is nothing more than a "rephrasing" of his free-exercise claim, "[i]t falls with [his argument] based on denial of religious freedom." *Prince v. Massachusetts*, 321 U.S. 158, 170 (1944).

### B. Denial of Leave to Amend

We review a district court's denial of leave to amend for abuse of discretion. *See Cohen v. Longshore*, 621 F.3d 1311, 1313 (10th Cir. 2010). But if the district court denied leave to amend because it determined that amendment would be futile, "our review for abuse of discretion includes de novo review of the legal basis for the finding of futility." *Full Life Hospice, LLC v. Sebelius*, 709 F.3d 1012, 1018 (10th Cir. 2013) (internal quotation marks omitted). "A proposed amendment is futile if the complaint, as amended, would be subject to dismissal." *Id.* (internal quotation marks omitted). A complaint is subject to dismissal under Fed. R. Civ. P. 12(b)(6) if the plaintiff fails to allege facts that would "allow[] the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### 1.    Oklahoma Religious Freedom Act

Fields contends that the district court should have allowed him to amend his complaint to include a claim under the Oklahoma Religious Freedom Act (ORFA), Okla. Stat. tit. 51, §§ 251–258 (2000). His argument on this point in his opening brief on appeal concludes by saying, "[F]or the reasons that Defendants violated Plaintiff's free exercise rights under the First Amendment, *see infra*, Defendants similarly violated Plaintiff's rights protected by ORFA." Aplt. Br. at 58. He does not argue that he can prevail under ORFA if he loses his free-exercise claim. Because we have affirmed the district court's denial of Fields's free-exercise claim, we also affirm the denial of his motion to amend his complaint to add an ORFA claim. The ORFA claim was doomed to failure, so an amendment to add it would have been futile.

### 2.    Free-Speech Retaliation

Fields argues that the district court should have allowed him to amend his complaint to include a claim that Defendants retaliated against him for filing this lawsuit, in violation of his First Amendment right to freedom of speech. We disagree.

Ordinarily, "[t]he First Amendment prohibits the government from punishing a person for exercising the right to free speech."[1] *Deutsch v. Jordan*, 618 F.3d 1093, 1097 (10th Cir. 2010). "When the government is [a] person's employer, however, the right to free speech is limited in ways that would otherwise be unconstitutional." *Id.* "Speech, for example, can be insubordinate, disruptive, or demoralizing; and government employers are not required to let such misconduct pass." *Merrifield*, 654 F.3d at 1079. "'Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services.'" *Id.* (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)).

To balance the public employee's right to speak as a citizen on matters of public concern against the government employer's interests in ensuring efficient public service, we use a five-step approach derived from *Garcetti* and *Pickering v. Board of Education*, 391 U.S. 563 (1968). *See id.* We consider:

> (1) whether the speech was made pursuant to an employee's official duties;
> (2) whether the speech was on a matter of public concern; (3) whether the
> government's interests, as employer, in promoting the efficiency of the
> public service are sufficient to outweigh the plaintiff's free speech interests;
> (4) whether the protected speech was a motivating factor in the adverse

---

[1] Perhaps Fields could have framed his claim as a violation of his right to petition. *See Borough of Duryea v. Guarnieri*, 131 S. Ct. 2488, 2491 (2011). But our analysis would be the same. *See id.* at 2494–95 (retaliation claims by public employees are subject to the same test regardless of whether they are under the Free Speech or Petition clauses of the First Amendment).

22

employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Leverington v. City of Colo. Springs*, 643 F.3d 719, 724 (10th Cir. 2011) (internal quotation marks omitted). The first three inquiries are ordinarily matters of law for the court to decide, while the last two are for the factfinder. *See Deutsch*, 618 F.3d at 1098. Under this analysis, a public employee's speech is unprotected if it was made pursuant to official duties, if it was not on a matter of public concern, or if the balance of interests favors the employer. *See id.* at 1097–98.

The district court rejected Fields's retaliation claim on the ground that the subject matter of his lawsuit was not a matter of public concern because Fields "allege[d] only an employment dispute that resulted from an alleged violation of his own personal rights; not any corruption, impropriety, or malfeasance on the part of officials in the [TPD]," Aplt. App., Vol. I at 129, and he had "offered no case law for the proposition that filing a lawsuit turns a dispute over the violation of personal rights into a public concern," *id.* at 129–30.

But we need not address the public-concern issue. Regardless of whether the lawsuit was on a matter of public concern, Fields's claim cannot survive the balancing of interests at the third step of the *Garcetti/Pickering* analysis. "In balancing the employee's interest in expression against the government's interest in efficiency, a court must consider 'the manner, time, and place of the employee's expression,' as well as the events leading up to it." *Lytle v. City of Haysville*, 138 F.3d 857, 863–64 (10th Cir. 1998)

23

(quoting *Rankin v. McPherson*, 483 U.S. 378, 388 (1987)).  Relevant considerations include "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise."  *Rankin*, 483 U.S. at 388.  "These considerations . . . make apparent that the state interest element of the test focuses on the effective functioning of the public employer's enterprise.  Interference with work, personnel relationships, or the speaker's job performance can detract from the public employer's function; avoiding such interference can be a strong state interest."  *Id.*

"[T]he State's burden in justifying a particular [employment action] varies depending upon the nature of the employee's expression."  *Connick v. Myers*, 461 U.S. 138, 150 (1983).  "[T]he employer's burden to justify its restriction on speech increases in proportion to the value of that speech in the public debate."  *Curtis v. Okla. City Pub. Sch. Bd. of Educ.*, 147 F.3d 1200, 1213 (10th Cir. 1998) (internal quotation marks omitted).  Similarly,  "'[t]he burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails.'"  *Id.* (quoting *Rankin*, 483 U.S. at 390).  "The employee's burden of caution is greater when the employee serves in a 'confidential, policymaking, or public contact role,' rather than, for example, a clerical role, because of the higher likelihood the employee's speech will cause disruption to the agency's successful functioning."  *Id.* (quoting *Rankin*, 483 U.S. at 390–91).

24

We begin with Fields's interests. He contends that he filed his lawsuit "seeking vindication of fundamental constitutional rights," Aplt. Reply Br. at 17, and that allowing a government employer to punish an employee for filing a civil-rights lawsuit will chill civil-rights litigation. To be sure, we have recognized that "[s]peech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of city officials, in terms of content, clearly concerns matters of public import," and that "an employee's First Amendment interest is entitled to greater weight where he is acting as a whistle blower in exposing government corruption." *Lytle*, 138 F.3d at 865 (internal quotation marks omitted). But, as we have already explained, Fields's free-exercise claim was based on an unreasonable construction of the Attendance Order, his Establishment Clause claim failed because no informed, reasonable observer would have perceived that TPD was endorsing Islam, and there was also no merit to his other claims. "[A] government employee's interest in whistleblowing is entitled to little weight if a reasonable person in his shoes would not have believed that there was government corruption or wrongdoing." *Id.* at 866. His claims are therefore "less important and less valuable to the public than is the speech often at issue in public employee speech cases." *Moore v. City of Wynnewood*, 57 F.3d 924, 933 (10th Cir. 1995).

TPD's interests, on the other hand, are compelling. We have long recognized that law-enforcement agencies have a "heightened interest . . . in maintaining discipline . . . among employees." *Lytle*, 138 F.3d at 867 (internal quotation marks omitted). Fields was a commanding officer. His challenge to a superior's order, by disobedience or by

25

litigation, sets a powerful example. It would likely undermine not just his superiors' confidence in his loyalty and willingness to implement orders, but also his own authority as a commander.

In addition, TPD must maintain public confidence that "police protection will be available to the public . . . and that the police will deal impartially with all." *Horstkoetter v. Dep't of Pub. Safety*, 159 F.3d 1265, 1274 (10th Cir. 1998) (internal quotation marks omitted) (police officers could be prohibited from allowing political signs in the yards of their homes, in part because of the government's interest in prohibiting the appearance of partisanship in law enforcement). In particular, the inclusion in the complaint of numerous largely irrelevant paragraphs attacking "shariah-adherent" Islam, Aplt. App., Vol. I at 17, would inevitably create the perception of hostility to a component of the community. *Cf. Locurto v. Giuliani*, 447 F.3d 159, 178–79 (2d Cir. 2006) ("Police officers . . . are quintessentially public servants. As such, part of their job is to safeguard the public's opinion of them, particularly with regard to a community's view of the respect that police officers . . . accord the members of that community.").

Fields contends that Defendants "never explain how any of their interests are legitimately advanced by punishing Plaintiff for filing this civil rights lawsuit." Aplt. Reply Br. at 20. But "[w]e have long said that we may affirm on any basis supported by the record, even if it requires ruling on arguments not reached by the district court or even presented to us on appeal." *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130

26

(10th Cir. 2011). In our view, permitting Fields to amend his complaint to add this retaliation claim would have been futile.

## III. CONCLUSION

We AFFIRM the district court's summary judgment for Defendants and its denial of leave to amend.