**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

THE HOUSING AUTHORITY OF THE
CITY OF PICHER, OKLAHOMA,

     Plaintiff,

v.

UNITED STATES OF AMERICA,
EX REL. SECRETARY, DEPARTMENT
OF HOUSING AND URBAN
DEVELOPMENT,

     Defendant - Appellee,

and

BOARD OF COUNTY
COMMISSIONERS OF THE COUNTY
OF OTTAWA, OKLAHOMA,

     Defendant - Appellant.

No. 16-5159
(D.C. No. 4:14-CV-00322-CVE-PJC)
(N.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **MATHESON**, **McKAY**, and **MORITZ**, Circuit Judges.
_____

---

    [*] After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

In this interpleader action, the Board of County Commissioners of the County of Ottawa, Oklahoma (the County) appeals the district court's entry of summary judgment to the United States, on behalf of the Secretary of the Department of Housing and Urban Development (HUD). Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. BACKGROUND

In the 1960s, the Housing Authority of the City of Picher, Oklahoma (PHA) began operating a low-income public housing project with financial assistance from HUD pursuant to a Consolidated Annual Contributions Contract (ACC). In 1983, the federal government designated a portion of Oklahoma, including the City of Picher, as the Tar Creek Superfund site due to health and environmental hazards from extensive zinc and lead mining operations. In 2004, the state of Oklahoma began relocating Picher's residents due to the health hazards and the risk of unexpected building collapse. In 2008, a tornado struck Picher and destroyed much of the housing project, rendering it uninhabitable. Picher, which was located in Ottawa County, ceased municipal operations in 2009 and began involuntary dissolution proceedings the next year.

After the tornado, the PHA obtained an insurance settlement of approximately $1.7 million and, for several years, explored whether to rebuild the project in the nearby town of Fairland. The PHA eventually sought HUD's permission to rebuild in Fairland, but HUD denied the request and directed that the project be terminated. When both HUD and the County requested the approximately $1.2 million remaining

2

in the PHA's bank account, PHA filed an interpleader action in Oklahoma state court. HUD removed the case to federal court and moved for summary judgment, arguing that the County was not entitled to the interpled funds because it was a stranger to the ACC, which expressly prohibited the creation of any enforcement right in a third party; the County was not involved in the project; the County could not claim to be a successor to the PHA because the project no longer existed; and the interpled funds belonged to HUD under the plain terms of the ACC. The County responded that the ACC was ambiguous, the County was the successor in interest to the City of Picher, HUD waived any claim to the interpled funds by waiting almost six years to make a claim, and the County had an equitable claim to at least a portion of the interpled funds for services it supplied to the project.

Meanwhile, the district court dismissed the PHA from the action because it disclaimed any interest to the funds. After summary-judgment briefing was complete, the district court transferred the case to the United States Court of Federal Claims, reasoning that it lacked jurisdiction. The Claims Court concluded that it lacked jurisdiction and transferred the case back to Oklahoma.

After the re-transfer, the Oklahoma district court determined that it in fact had jurisdiction and granted HUD's motion for summary judgment. Applying federal law, the court first ruled that the ACC unambiguously provided that all of the funds remaining after termination of the project belonged to HUD. It based that conclusion on the confluence of numerous contractual provisions, the most pertinent of which we outline.

3

One contractual provision defined a "General Fund": "All monies and investment securities received by or held for the account of the [PHA] in connection with the development, operation and improvement of projects in accordance with an ACC with HUD shall constitute the 'General Fund.'" Aplt. App., Vol. I at 48. Another required the PHA to "deposit and invest all funds and investment securities received by or held for the account of the [PHA] in connection with the development, operation and improvement of the projects . . . in accordance with the terms of [a] General Depository Agreement," *id.*, which the parties had executed separately. The ACC defined "Operating receipts" as "all rents, revenues, income, and receipts accruing from, out of, or in connection with the ownership or operation of [the] project." *Id.* at 46. The ACC further required the PHA to purchase a variety of insurance coverages, including a "Commercial Property [policy] . . . written with a blanket limit, on a replacement cost basis, and with an agreed value clause eliminating any coinsurance provision." *Id.* at 85.[1] It also required the PHA to use any insurance proceeds to "restore, reconstruct, and/or repair any damaged or

---

[1] The commercial-property insurance requirement was set out in an attachment to the ACC that was referred to in Section 13 of the ACC: "The types of insurance required, or that should be purchased, and other requirements with respect to insurance coverage are listed in Part B, Attachment VII, of this ACC." Aplt. App., Vol. I at 50. The district court did not discuss this provision but based its view that the PHA was required to purchase insurance on another provision in Section 13, one requiring the PHA to "procure adequate insurance to protect the [PHA] from financial loss resulting from various hazards if the [PHA] determines that exposure to certain hazards exists." *Id.* As the County points out, that provision did not require the PHA to purchase "various hazards" insurance unless it deemed it necessary to do so. However, Attachment VII clearly required the PHA to purchase commercial property insurance.

destroyed property of a project, except with the written approval of HUD to the contrary." *Id.* at 50–51. And perhaps most importantly to this case, the ACC provided that in the event the project was terminated, "all project reserves shall become part of another project administered by the [PHA] in accordance with the terms of [the] ACC. If no other project(s) under management exists, the remaining project reserves shall be distributed *as directed by HUD*." *Id.* at 51 (emphasis added).

Here, HUD denied the PHA's request to rebuild the project in Fairland and instead terminated the project and directed that the remaining funds be returned to HUD. Hence, the district court concluded that the funds belonged to HUD. The court acknowledged that the ACC permitted the PHA to pool funds unrelated to the project or HUD in the account where it kept project funds: "The [PHA] may . . . deposit into an account covered by the terms of the General Depository Agreement, by lump-sum transfers of funds from the depositories of *other projects or enterprises* of the [PHA] *in which HUD has no financial interest*, amounts necessary for current expenditures of items chargeable to all projects and enterprises of the [PHA]." *Id.* at 48 (emphasis added). But the court concluded that the insurance proceeds did not arise out of "other [PHA] projects or enterprises . . . in which HUD had no financial interest," *id.*, but from an insurance policy that the ACC required the PHA to maintain as part of its deal with HUD and that was paid for with federal grant money.

5

The court further concluded that even if the PHA had a claim to the remaining funds, the ACC unambiguously prohibited third-party claims against either the PHA or HUD: "[N]othing in this ACC shall be construed as creating any right of any third party to enforce any provision of the ACC or to assert any claim against HUD or the [PHA]." *Id.* at 55. And to the extent the County claimed a right to the remaining funds as the successor of the dissolved City of Picher, the court pointed out a distinction between the PHA, which was a party to the ACC, and the City of Picher, which was not. The court therefore reasoned that the County remained a stranger to the ACC.

The district court addressed two other arguments the County made. It first rejected the contention that by waiting six years to make a claim on the insurance proceeds, HUD waived its claim to the interpled funds. The court reasoned that HUD did not need to make a separate claim to the funds because the ACC vested HUD with the right to request the return of any project reserves in the General Fund (i.e., the PHA's bank account subject to the General Depository Agreement) when the project was terminated. Second, the court declined the County's request for $135,912 in equitable relief for services the County claimed it had provided to the PHA between 2008 and 2013. The court concluded that the provision of services to the PHA had no relationship to the ACC and that many of the services were those the County was bound to provide as the county in which the project was located.

6

## II. DISCUSSION

We review an order granting summary judgment de novo, "applying the same standards that the district court should have applied." *Fields v. City of Tulsa*, 753 F.3d 1000, 1008 (10th Cir. 2014) (internal quotation marks omitted). A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[W]e examine the record and all reasonable inferences that might be drawn from it in the light most favorable to the nonmoving party." *Fields*, 753 F.3d at 1009 (internal quotation marks omitted).

After fully considering the record, the parties' arguments, and the governing law, we are convinced that the district court properly granted summary judgment to HUD. We therefore affirm the district court's judgment for substantially the reasons the district court provided. We add only the following.

The County claims the district court overlooked or improperly analyzed a number of its arguments. But almost all of those arguments concern the PHA's right to the funds, not the County's. Although the County claims it "stepped 'into the shoes' of the City (*including [the] PHA*)" when Picher was dissolved, Aplt. Opening Br. at 21 (emphasis added), the only legal authority it cites, M. Anderson, *Dissolving Cities*, 121 Yale L.J. 1364 (2012), concerns succession to a dissolved *city* and makes no mention of a city's public housing authority. Further, as the Oklahoma Supreme Court explained in determining whether bonds issued by a housing authority were an indebtedness of the state, a housing authority is, by Oklahoma statute, "'a public

7

body corporate and politic'"—which is how the PHA described itself in its interpleader petition, *see* Aplt. App., Vol. I at 13—and therefore not "an agency or instrumentality of a city or county." *Boardman v. Okla. City Hous. Auth.*, 445 P.2d 412, 416 (Okla. 1968) (quoting Okla. Stat. tit. 63, § 1055); *accord Hon. Charles W. Van*, 11 Okla. Op. Atty. Gen. 482, Okla. A.G. Opin. No. 79-303, 1980 WL 114835, at *2 (Jan. 22, 1980) ("Public housing authorities created pursuant to [the Oklahoma Housing Authority Act, which includes § 1055], are not instrumentalities of the city or county within which they sit and, therefore, are not subject to the Political Subdivisions Tort Claims Act."). We therefore conclude that the County failed to establish that it stepped into the PHA's shoes by virtue of Picher's dissolution. Consequently, we need not address the County's contentions about the PHA's rights to the funds that it claims the district court overlooked or improperly analyzed.

### III.  CONCLUSION

The judgment of the district court is affirmed.

Entered for the Court

Monroe G. McKay
Circuit Judge

8